AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>DMITRY FEDOSEEV, IRINA FEDOSEEVA,<br>SIARHEI PATAPAU, and TIMUR SAFIN | DOCKET NO. |
| | FILED<br>CLERK, U.S. DISTRICT COURT<br>APR 18 2016<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |
| | MAGISTRATE'S CASE NO.<br>16-0825M |

| Complaint for violation of Title 18, United States Code, Section 1029(b)(2) |
|---|

| NAME OF MAGISTRATE JUDGE<br>HONORABLE JACQUELINE CHOOLJIAN | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>Date Unknown through April 18, 2016 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION: *Knowingly and with intent to defraud*

### [18 U.S.C. § 1029(b)(2)]

Beginning on a date unknown and continuing to on or about April 18, 2016, in Los Angeles County, within the Central District of California, defendants DMITRY FEDOSEEV, IRINA FEDOSEEVA, SIARHEI PATAPAU, and TIMUR SAFIN knowingly and intentionally conspired to use unauthorized access devices in a one-year period to obtain things of value aggregating to $1,000 or more *during that period, and engaged in conduct in furtherance of such offense.*

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>William H. Cone /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>JACQUELINE CHOOLJIAN | DATE<br>April 18, 2016 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Poonam G. Kumar x0719 | REC: Detention

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, William Cone, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2010.  Since 2013, I have been assigned to the Los Angeles Field Office, Transnational Organized Crime – Eastern Hemisphere Squad, where I investigate violations of federal law related to violent and organized crime, art theft, access device fraud, and bank fraud.  In 2010, I attended and completed the FBI 21-week academy.  My academy training at the FBI included courses in the methods and schemes utilized by individuals and groups to commit financial and technology based-crimes, fraud, and identity theft.  From 2010 to 2013, I served on a counterterrorism squad in Los Angeles Field Office's Orange County Resident Agency, where I investigated violations of federal law related to criminal and counterterrorism matters.

2.    As a result of assignments to these various FBI squads, I have participated in numerous search warrants and arrests involving financial and technology-based crimes.  I have recovered and seized various quantities of currency and property that were proceeds of fraud related crimes.  Through these means, I have accumulated knowledge of schemes and designs commonly used to commit financial and technology-based crimes, as well as the practices that people who commit financial and technology-based crimes employ while attempting to thwart law

1

Instrumentality Protocol

enforcement's efforts to effectively gather the necessary evidence to lead to conviction.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of criminal complaints against and arrest warrants for DMITRY FEDOSEEV ("FEDOSEEV"), IRINA FEDOSEEVA ("FEDOSEEVA"), SIARHEI PATAPAU ("PATAPAU"), and TIMUR SAFIN ("SAFIN") for conspiring to use unauthorized access devices in a one-year period to obtain things of value aggregating to $1,000 or more, in violation of 18 U.S.C. § 1029(b)(2).

4.    This affidavit is made in support of an application for a search warrant for SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT PREMISES 3, SUBJECT VEHICLE 1, SUBJECT VEHICLE 2, and SUBJECT VEHICLE 3, as described below and in attachments A-1 through A-6, for the items to be seized described in Attachment B.

5.    The facts set forth in this affidavit are based upon my direct conversations with other law enforcement agents, my training and experience and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

2

Instrumentality Protocol

## III. PREMISES AND PROPERTY TO BE SEARCHED

6.    The SUBJECT PREMISES and SUBJECT VEHICLES to be searched, as described in Attachments A-1 through A-6, which are incorporated herein by reference, are as follows:

a.    The residence located at 333 S. Kingsley Drive, Unit 335, Los Angeles, California 90020 and any designated storage spaces ("SUBJECT PREMISES 1").

b.    The residence located at 431 S. Burnside Ave, Apartment 9K, Los Angeles, California 90036 ("SUBJECT PREMISES 2").

c.    The residence located at 6138 Franklin Ave, Apartment PH427, Los Angeles, California 90028 ("SUBJECT PREMISES 3")

d.    A white Nissan Murano bearing vehicle identification number ("VIN") JN8AZ08T74W201796 and California license plate 7FXR879 ("SUBJECT VEHICLE 1").

e.    A grey Lexus RX350 bearing VIN 2T2BK1BAXDC178309 and California license plate 6YHU979 ("SUBJECT VEHICLE 2").

f.    A silver Toyota Prius bearing VIN JTDKN3DU4A0071129 and California license plate 6JVA789 ("SUBJECT VEHICLE 3").

## IV. ITEMS TO BE SEIZED

7.    The items to be seized are the evidence, fruits, and instrumentalities of violations of the following:  18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1029 (Access Device Fraud); 18 U.S.C. § 1028A (Aggravated Identity Theft), and 18 U.S.C. § 1030

3

Instrumentality Protocol

(Fraud in Connection with Computers) (collectively, the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

### V.  SUMMARY OF PROBABLE CAUSE

8.    On or about December 18, 2015, a cyber intruder(s) accessed the software system of Polestar Benefits, Inc. ("Polestar"), a healthcare Third Party Administrator.  During this intrusion, the cyber intruders re-activated the accounts of 43 previous employees of one of Polestar's clients, affiliated those accounts to a Dependent Care Plan, and then ordered 10 Flexible Spending Account cards, which functioned essentially as credit cards, to be mailed to a variety of locations.  Among the cards ordered were:  (a) a MasterCard ending in 6977 in the name of Anthony Kleiner ("MasterCard 6977"); (b) a MasterCard ending in 8116 in the name of Audrey Chan Woo ("MasterCard 8116"); and (c) a MasterCard ending in 4504 in the name of Damir Zhanov ("MasterCard 4504").

9.    Based on my review of credit card and retail store receipts, the cards ordered were used to make fraudulent purchases and, in some cases, exchange the items purchased for gift cards from various retail stores.  Based on video surveillance from the retail stores and photograph stills therefrom, I believe SAFIN caused at least approximately $125,882.63 in purchases to be made on MasterCard 6977; PATAPAU cased at least $141,281.17 in purchases to be made on MasterCard 4504; and FEDOSEEV and FEDOSEEVA caused at least approximately $65,933.93 in purchases to be made on MasterCard 8116.

Instrumentality Protocol

10.   During the investigation, SUBJECT PREMISES 1 through 3 were identified as locations at which SAFIN, PATAPAU, FEDOSEEV, or FEDOSEEVA reside, and SUBJECT VEHICLES 1 through 3 were identified as vehicles used by SAFIN, PATAPAU, FEDOSEEV, or FEDOSEEVA.

## VI. STATEMENT OF PROBABLE CAUSE

### A.   Polestar Benefits, Inc. Cyber Intrusion

11.   Based on the investigation to date and reports of conversations with Polestar President Eric Graham and Operations Manager Karen Montgomery, and my discussions with other law enforcement agents, I have learned that Polestar is a Lake Oswego, Oregon-based healthcare Third Party Administrator that offers Flexible Spending Accounts ("FSA") and COBRA services for their clients.   FSAs are special accounts into which a person puts pre-tax money directly from their paycheck in order to pay for out-of-pocket health care costs.   When an FSA is funded, a debit card is issued to the account holder to use to pay for medical or health care expenses such as doctor visits and prescriptions.   These debit cards are limited by Merchant Category Codes ("MCC") to certain types of purchases.   Pre-tax money may also be allotted for dependent care.   Dependent care accounts may be used only to pay for childcare expenses or elderly care expenses.   The person funding the dependent care account must prove they are eligible.   Debit cards are not issued for dependent care accounts.   Instead, the person pays the cost for the dependent care up front and is reimbursed from the dependent care account once they provide the receipts for

5

Instrumentality Protocol

this care.  Based on the investigation to date and my
conversations with Polestar employees and other law enforcement
agents, I have learned that Polestar facilitates two types of
FSA accounts:  (1) medical expenses previously non-reimbursed by
health insurers and (2) dependent care expenses.

12.  One of Polestar's clients is Lane Community College
("LCC"), a two-year college located in Eugene, Oregon.  Polestar
used online software services provided by Alegeus, a Florida
company, to facilitate their business.  Using the Alegeus
software platform, Polestar accounts managers facilitate FSA and
dependent care accounts for businesses which contract with
Polestar to provide those benefits.  Polestar creates the plans
for each customer, assigns MCCs for the FSA cards, and funds the
FSA cards.  Once FSA cards are created and issued using this
platform, a MasterCard-approved fulfillment vendor is notified
who then mails the FSA cards to the recipients.  Polestar also
sets up dependent care accounts for LCC employees who opted to
have one.  The funds in dependent care accounts are then used to
reimburse the LCC employees once they provide the receipts
showing they have paid for the care of a dependent.

13.  Based on my conversations with Polestar employees and
records provided by Alegeus, I have learned that Polestar
believes that between December 18, 2015 and January 18, 2016, an
unknown individual(s) accessed the Alegeus software system using
the credentials of an account manager employed by Polestar
without authorization from Polestar.  Polestar realized that
there had been a cyber intrusion when looked at the account

Instrumentality Protocol

manager's profile and saw the unauthorized charges on these accounts. Polestar learned that the cyber intruder(s) re-activated the accounts of 43 previous employees of LCC and affiliated those re-activated accounts to dependent care accounts for which the intruder had created a plan. Once the affiliation was completed, the intruder(s) ordered several debit cards under the plan they had set up, to be mailed to a variety of locations. The cyber intruder(s) set the limits for these cards anywhere from $500,000 to as high as $5,000,000. The cards were created and modified in such a way that they functioned as credit cards. Specifically, instead of the cards having a limited number of MCCs assigned to them under a particular plan as they normally are, these cards were placed under a plan created by the cyber intruder(s) using the account manager's credentials in which all MCCs were enabled. This allowed cards issued under the plan to function as regular credit cards instead of a typical FSA card, which has limited MCCs. It is unknown at this time how the plan for dependent care was created, issued debit cards, and funded.

14. Based on the investigation to date and my conversations with Polestar employees and other law enforcement agents, I have learned that, of the 43 LCC accounts which were fraudulently re-activated, ten cards were ultimately funded, mailed, and subsequently used to make in-store point-of-sale ("POS") purchases at multiple retail outlets in California, Maryland, New Jersey and Moscow, Russia.

7

Instrumentality Protocol

15.   Based on the investigation to date and my
conversations with Polestar employees and other law enforcement
agents, I have learned that, on January 19, 2016, after
discovering the fraudulent transactions and determining that an
account manager's credentials on the Alegeus platform had been
used without authorization, Polestar notified the FBI of the
fraud and suspected computer intrusion.  Based on the
investigation to date and my conversations with Polestar
employees and other law enforcement agents, I have learned that,
as of January 20, 2016, between approximately $542,692.45 and
$559,692.92 in fraudulent purchases had been made with these ten
cards.  Of that amount, approximately $333,097.73 has been
linked to purchases made on MasterCard 4504, MasterCard 6977,
and MasterCard 8116.  Through comparison of surveillance video
from the retail stores to photographs on file with California
Department of Motor Vehicles ("DMV"), FEDOSEEV, FEDOSEEVA,
PATAPAU, and SAFIN made at least $200,000 of these purchases
using MasterCard 4504, MasterCard 6977, and MasterCard 8116.
Surveillance video for the remaining transactions is unavailable
at this time.

  B.   **PATAPAU Uses MasterCard 4504 to Purchase Approximately
       $115,237.89 in Goods from Retail Stores, with
       Surveillance Imagery**

16.   Based on my review of credit card records, I have
determined that MasterCard 4504 was used to make approximately
$115,237.89 in purchases at various retail stores between
approximately January 16, 2016 and January 18, 2016.  I have

Instrumentality Protocol

reviewed surveillance video and photograph stills from the retail stores from the dates and times of the purchases. Based on my comparison of video surveillance from the retail stores and corresponding photograph stills with the photograph of PATAPAU on file with the DMV, I believe PATAPAU made at least approximately \$115,237.89 of these purchases.[1]

17. Based on my review of retail store receipts and surveillance video and photograph stills therefrom, PATAPAU was seen at various locations in the pertinent stores at the time of the purchases on the following dates and times:

| Date of Purchase | Approximate Time of Purchases according to receipts | Approximate Combined Total of Purchases | Retail Store and Location | Approximate Times PATAPAU seen on surveillance video |
|---|---|---|---|---|
| January 16, 2016 | 12:35 p.m. | \$17,144.22 | Greenmile Hydro Organics (San Bernardino, California) | 12:21 p.m., 12:29 p.m., 12:30 p.m., 12:41 p.m. |
| January 16, 2016 | 1:35 p.m. | \$14,465.62 | Green Forest Hydroponics (Riverside, California) | 1:21 p.m. through 1:24 p.m. |

---

[1] As set forth below in paragraph 19, law enforcement first identified PATAPAU through a rental agreement for a car seen by employees of a retail store where PATAPAU attempted to use MasterCard 4504.

9

Instrumentality Protocol

| Date of Purchase | Approximate Time of Purchases according to receipts | Approximate Combined Total of Purchases | Retail Store and Location | Approximate Times PATAPAU seen on surveillance video |
|---|---|---|---|---|
| January 16, 2016 | 5:12 p.m. | $2,936.46 | Home Depot #6629 (Monrovia, California) | 5:12 p.m., 5:17 p.m. |
| January 16, 2016 | 5:53 p.m. | $3,382.24 | Home Depot #6629 (Monrovia, California) | 5:59 p.m. |
| January 16, 2016 | 7:02 p.m. | $3,159.70 | Target #302 (Duarte, California) | 7:03 p.m. |
| January 16, 2016 | Between 8:07 p.m. and 8:36 p.m. | $2,589.13 | Target #2627 (Azusa, California) | 8:07 p.m., 8:13 p.m., 8:27 p.m. |
| January 16, 2016 | 10:39 p.m. | $584.78 | Target #2775 (Los Angeles, California) | 10:43 p.m. |
| January 17, 2016 | 9:28 a.m. | $1,954.11 | Target #2775 (Los Angeles, California) | 9:28 a.m., 9:30 a.m., 9:39 a.m. |
| January 17, 2016 | 10:05 a.m. | $2,658.62 | Target #1884 (West Hollywood, California) | 10:03 a.m., 10:10 a.m. |
| January 17, 2016 | 10:33 a.m. | $3,111.95 | Home Depot #6616 (Hollywood, California) | 10:34 a.m. |

10

Instrumentality Protocol

| Date of Purchase | Approximate Time of Purchases according to receipts | Approximate Combined Total of Purchases | Retail Store and Location | Approximate Times PATAPAU seen on surveillance video |
|---|---|---|---|---|
| January 17, 2016 | 12:17 p.m. | $5,176.14 | Apple Store #R050 (Los Angeles, California) | 12:05 p.m., 12:13 p.m., 12:17 p.m. |
| January 17, 2016 | Between 3:56 p.m. and 3:59 p.m. | $9,072.98 | Apple Store #R124 (Los Angeles, California) | 3:37 p.m., 3:40 p.m., 3:43 p.m., 3:46 p.m., 4:01 p.m. |
| January 17, 2016 | 4:51 p.m. | $10,472.73 | Apple Store #R124 (Los Angeles, California) | 4:47 p.m., 4:51 p.m., 4:53 p.m. |
| January 17, 2016 | 6:09 p.m. | $17,454.55 | Apple Store #R050 (Los Angeles, California) | 6:00 p.m., 6:07 p.m., 6:10 p.m., 6:11 p.m. |
| January 17, 2016 | 7:58 p.m. | $6,112.55 | Best Buy #393 (West Hollywood, California) | 7:39 p.m., 7:43 p.m., 8:02 p.m. |
| January 17, 2016 | 8:27 p.m. | $2,098.16 | Target #1884 (West Hollywood, California) | 8:23 p.m., 8:30 p.m. |
| January 17, 2016 | 9:01 p.m. | $2,840.28 | Home Depot #6616 (Hollywood, California) | 9:02 p.m. |
| January 17, 2016 | 10:00 p.m. | $2,413.39 | Target #2775 (Los Angeles, California) | 9:59 p.m., 10:06 p.m. |

11

Instrumentality Protocol

| Date of Purchase | Approximate Time of Purchases according to receipts | Approximate Combined Total of Purchases | Retail Store and Location | Approximate Times PATAPAU seen on surveillance video |
|---|---|---|---|---|
| January 18, 2016 | 7:38 a.m. | $1,466.05 | Home Depot #0612 (Canoga Park, California) | 7:40 a.m. |
| January 18, 2016 | 8:07 a.m. | $2,921.10 | Home Depot #6632 (Woodland Hills, California) | 8:14 a.m. |
| January 18, 2016 | 8:44 a.m. | $3,223.13 | Home Depot #1070 | 8:44 a.m. |
| | | $115,237.89 | | |

18.  Based on my review of the receipts from Greenmile Hydro Organics and Green Forest Hydroponics, I know that the items purchased using MasterCard 4504 included hydroponic equipment, including grow lights, control mechanisms, ventilations systems, fans, and reflectors.

19.  In addition, on January 16, 2016, at approximately 4:32 p.m., MasterCard 4504 was used to make approximately $4,282.06 in purchases at Boldly Grow Hydro, located at 1721 E. Colorado Boulevard, Pasadena, California.  Based on my review of reports from other law enforcement agents, towards the end of the purchase, the individual claiming to be Damir Zhanov, the accountholder of MasterCard 4504, stated he was going to send in some associates to pick up the merchandise.  Boldly Grow Hydro

Instrumentality Protocol

employees became suspicious, and photographed the vehicle used by the individual claiming to be Zhanov, a black 2014 Mercedes-Benz SUV with California license plate 7GGD490 ("Mercedes-Benz 7GGD490"). Afterwards, Boldy Grow Hydro employees, still suspicious, informed the associates who had arrived that they would have to contact the bank to verify the purchase. The purchaser's associates appeared to get scared, abandoned the purchases, and left the store.

20. A vehicle matching the description of the Mercedes-Benz 7GGD490 was observed on surveillance video stills on January 16, 2016 at approximately the same time period that MasterCard 4504 was used by an individual I believe to be PATAPAU to make a combined total of approximately $2,589.13 in purchases at Target #2627, located at 809 N. Azusa Avenue, Azusa, California. Through the course of this investigation, I have learned that, on February 2, 2016, FBI Task Force Officers queried DMV records and learned that Mercedes-Benz 7GGD490 was registered to Enterprise Rent-a-Car. I have learned that Enterprise Rent-a-Car told law enforcement officers that Mercedes-Benz 7GGD490 had been rented on January 15, 2016 at 2:36 p.m. from a West Hollywood, California Enterprise Rent-a-Car. I learned that the individual who rented the car presented a California Driver License in PATAPAU's name and provided the address of 915 N. Wilton Place #103, Los Angeles, California. Based on Enterprise records, the Mercedes-Benz 7GGD490 was returned to Enterprise Rent-a-Car on January 18, 2016 at 11:54 AM after having been driven 432 miles during the rental period.

13

Instrumentality Protocol

21.  Based on my review of Home Depot receipts, I know that the following items were purchased using MasterCard 4504: tools, including circular saws, hammer driver drills, impact drivers, power saws, routers, power drills, hand planers, grinders, power sanders, screwguns, drywall guns, impact wrenches, nail guns, rotary hammers, saw blades, tubing cutters, levels, metal shears, hole hawgs, and line lasers.

C.   **Additional MasterCard 4504 Purchases During Same Time Period as PATAPAU's Purchases**

22.  Based on my review of credit card transaction records, Best Buy receipts, Palm Tree Hydroponics receipts, Boldly Grow Hydro receipts, and my conversations with other law enforcement agents, I have learned that MasterCard 4504 was used to make an additional $26,043.28 in purchases at Best Buy stores, Palm Tree Hydroponics, and Boldly Grow Hydro on January 16, 2016 and January 17, 2016.  No surveillance video of these transactions was available upon request.

D.   **Unknown Person(s) Returns Approximately $12,770.76 in Goods Purchased Using MasterCard 4504**

23.  Based on my review of Best Buy receipts, I have learned that between January 19, 2016 and January 23, 2016, approximately $4,149.23 in purchases originally made at a Best Buy store on January 17, 2016 using MasterCard 4504, were returned at three different Best Buy stores.  As a result of these returns, $1,346.14 was credited to a Best Buy gift card ending in 4979, $2,000 was credited to a Best Buy gift card ending in 8973, $564.71 was credited to a Best Buy gift card

14

Instrumentality Protocol

ending in 6914, and $238.38 was credited to a Best Buy gift card ending in 1878.  Based on my understanding of Best Buy's retention policy, I do not believe any surveillance video of these transactions is available.

24.  Based on my review of Best Buy receipts, I have learned that on January 20, 2016 at approximately 3:34 PM, approximately $1,809.33 in purchases originally made at a Best Buy store on January 17, 2016 using MasterCard 6977, were exchanged at Best Buy #183 for $1,867.88 in purchases.  The $58.55 difference was paid for utilizing Best Buy Gift card ending 4504 described above.  Based on my understanding of Best Buy's retention policy, I do not believe any surveillance video of these transactions is available.

25.  Based upon my review of Best Buy receipts, I have learned that on January 23, 2016, approximately $3,258.92 in purchases originally made on January 16, 2016 at a Best Buy store using MasterCard 4504, were returned at two other Best Buy stores.  As a result of these returns, $1,318.76 was credited to Best Buy gift card ending in 0752, and $1,940.16 was credited to Best Buy gift card ending in 7615.  Based on my understanding of Best Buy's retention policy, I do not believe any surveillance video of these transactions is available.

26.  Based upon my review of Best Buy receipts, I have learned that between January 27, 2016 and January 30, 2016, approximately $3,553.28 in purchases originally made on January 17, 2016 at a Best Buy store using MasterCard 4504, were returned at two different Best Buy stores.  As a result of these

15

Instrumentality Protocol

returns, $1,667.62 was credited to Best Buy gift card ending in 8976, $1,231.67 was credited to Best Buy gift card ending in 9564, and $653.99 was credited to Best Buy gift card ending in 5882.  Based on my understanding of Best Buy's retention policy, I do not believe any surveillance video of these transactions is available.

    **E.    Identification of SAFIN**

    27.  As set forth above, PATAPAU was identified through Enterprise Rent-a-Car records.  Based on my review of FBI reports, I understand that FBI Task Force Officers learned that PATAPAU had also previously rented a 2015 black Chevrolet Suburban bearing California license plate 7GSZ661 on December 7, 2015 from Enterprise Rent-a-Car.  PATAPAU presented a California Driver's license in his name and listed the address of 915 N. Wilton Place #103, Los Angeles, California, at the time of the rental.  PATAPAU also designated another driver for this rental, an individual with a California Driver's License in the name of "Artur Filatov."

    28.  Based on my review of FBI reports, I know that law enforcement agents conducted a search of the Accurint database and identified "Artur Filatov" as the subscriber to telephone number (425) 505-7595.  A search of a different FBI database for this telephone number identified that it was being used by an individual known as Arthur Last Name Unknown ("LNU").  FBI databases also identified that witnesses have previously stated that Arthur LNU is associated with SAFIN.  Law enforcement then reviewed SAFIN's photograph with the DMV and recognized it as

16

Instrumentality Protocol

the individual who used MasterCard 6977 in the transactions set forth below.

    **F.**    **SAFIN Uses MasterCard 6977 to Purchase Approximately $92,800.71 in Goods from Retail Stores**

    29.  Based on my review of credit card records, I have determined that MasterCard 6977 was used to make approximately $92,800.71 in purchases at various retail stores between approximately January 16, 2016 and January 17, 2016.  I have reviewed surveillance video and photograph stills from the retail stores from the dates and times of the purchases.  Based on my comparison of video surveillance from the retail stores and corresponding photograph stills with the photograph of SAFIN on file with the DMV, I believe SAFIN made at least approximately $92,800.71 of these purchases.[2]

    30.  In addition to the transaction set forth above, based on my review of retail store receipts and surveillance video and photograph stills therefrom, SAFIN was seen in the store at the time of the purchases using MasterCard 6977 on the following dates and times:

---

[2] As set forth in paragraph 27, SAFIN was identified through his association with a second driver listed on a car rental agreement rented by PATAPAU.

Instrumentality Protocol

| Date of Purchase | Approximate Time of Purchases on MasterCard 6977 according to receipts | Approximate Combined Total of Purchases | Retail Store and Location | Approximate Times SAFIN seen on surveillance video |
|---|---|---|---|---|
| January 16, 2016 | Between 3:02 p.m. and 3:15 p.m. | $7,057.11 | Best Buy #104 (Hawthorne, California) | 3:03 p.m., 3:04 p.m., 3:15 p.m. |
| January 16, 2016 | 4:13 p.m. | $4,798.87 | Best Buy #1011 (El Segundo, California) | 4:13 p.m. |
| January 16, 2016 | Between 5:10 p.m. and 5:25 p.m. | $5,260.95 | Best Buy #1510 (Culver City, California) | 5:27 p.m. |
| January 16, 2016 | Between 6:39 p.m. and 6:52 p.m. | $7,544.55 | Best Buy #109 (Los Angeles, California) | 6:28 p.m., 6:44 p.m., 6:45 p.m., 6:48 p.m., 6:52 p.m., 6:53 p.m. |
| January 16, 2016 | Between 7:24 p.m. and 7:32 p.m. | $1,556.49 | Best Buy #764 (Sherman Oaks, California) | 7:15 p.m., 7:32 p.m. |
| January 16, 2016 | Between 8:07 p.m. and 8:27 p.m. | $8,150.51 | Best Buy #1180 (Northridge, California) | 8:00 p.m., 8:08 p.m., 8:10 p.m., 8:30 p.m. |
| January 16, 2016 | 8:56 p.m. | $6,214.78 | Best Buy #130 (Northridge, California) | 8:45 p.m., 8:55 p.m., 8:58 p.m. |

Instrumentality Protocol

| January 17, 2016 | Between 2:09 p.m. and 2:21 p.m. | $6,287.77 | Best Buy #183 (Los Angeles, California) | 2:12 p.m., 2:20 p.m. |
|---|---|---|---|---|
| January 17, 2016 | Between 3:01 p.m. and 3:34 p.m. | $10,075.60 | Apple Store #R001 (Glendale, California) | 2:52 p.m., 3:02 p.m., 3:25 p.m., 3:35 p.m. |
| January 17, 2016 | Between 4:53 p.m. and 4:58 p.m. | $10,896.10 | Apple Store #R034 (Pasadena, California) | 4:37 p.m., 4:50 p.m., 4:58 p.m. |
| January 17, 2016 | Between 5:29 p.m. and 5:53 p.m. | $8,970.92 | Best Buy #125 (Pasadena, California) | 5:20 p.m., 5:31 p.m. |
| January 17, 2016 | Between 6:57 p.m. and 7:01 p.m. | $2,674.86 | Apple Store #R148 | 6:53 p.m., 6:55 p.m., 6:59 p.m., 7:01 p.m. |
| January 17, 2016 | Between 7:39 p.m. and 8:04 p.m. | $8,296.66 | Best Buy #764 (Sherman Oaks, California) | 7:50 p.m., 8:05 p.m. |
| January 17, 2016 | Between 10:16 p.m. and 10:22 p.m. | $5,015.54 | Target #1306 (Los Angeles, California) | 10:15 p.m., 10:20 p.m., 10:31 p.m. |
| | | $92,800.71 | | |

**G.   Additional MasterCard 6977 Purchases During Same Period as SAFIN's Purchases**

31.   Based on my review of credit card transaction records, Best Buy receipts, and my conversations with other law enforcement agents, I have learned that MasterCard 6977 was used

19

Instrumentality Protocol

to make an additional $33,081.92 in purchases at Best Buy stores on January 16, 2016 and January 17, 2016.  No surveillance video of the transactions was available upon request.

**H.    SAFIN's Use of SUBJECT VEHICLE 3**

32.  On March 7, 2016, an FBI Task Force Officer reviewed security images from January 16, 2016, between approximately 8:30 p.m. and 8:34 p.m., from Best Buy #1180, located at 19350 Nordhoff Way, Northridge, California, approximately three minutes after MasterCard 6977 was used to make a combined total of approximately $8,150.51 in purchases from Best Buy #1180 and SAFIN was observed exiting the store.  The images captured SUBJECT VEHICLE 3 in the parking lot.  A check of DMV records revealed the vehicle was registered to a "Saein Timur," a variation of the SAFIN's name, at 1227 North Gower Street Apt. 224, Los Angeles, California.  The North Gower address is not SAFIN's address on record with the DMV.  Based on my training and experience, I know that individuals frequently live at locations other than the address on their DMV records.

**H.    Identification of SUBJECT PREMISES 3 as SAFIN's Residence**

33.  Based on my review of Los Angeles Police Department ("LAPD") and FBI reports and my conversations with law enforcement officers, I have learned that law enforcement agents conducted a search of available databases and learned that SAFIN was associated with the address of 6138 Franklin Avenue in Los Angeles, California.  Based on my review of LAPD and FBI reports and my conversations with law enforcement officers, I have

20

Instrumentality Protocol

learned that on April 11, 2016, LAPD Detectives interviewed
Steven Sapp, the Leasing Manager of Hollywood Tower Apartments,
located at 6138 Franklin Avenue, Los Angeles, California. Sapp
identified SAFIN by name and photograph as the tenant in SUBJECT
PREMISES 3 and confirmed SAFIN has a Prius, which matches the
model of SUBJECT VEHICLE 3.

I.    **Unknown Male Returns $3,593.44 in Goods Purchased
      Using MasterCard 6977**

34.   Based on my review of credit card records, Best Buy
records, and my conversations with other law enforcement agents,
I have learned that, between approximately 4:09 p.m. and 4:33
p.m., on January 26, 2016, $3,593.44 in goods purchases
originally made between January 16-17, 2016, at Best Buy #104,
Best Buy #183, Best Buy #137, Best Buy #764, and Best Buy #179
using MasterCard 6977, were returned at Best Buy #1180, located
at 19350 Nordhoff Way, Northridge, California.  MasterCard 6977
was credited in the amount of $3,593.44.  I have reviewed
surveillance video and stills from the surveillance video from
Best Buy #1180 from that date and time.  Based on my review of
this video and photograph stills, I observed a male suspect
("UM1") enter the store with items and exit without them. To
date, the investigation has been unable to identify this male
suspect.

J.    **FEDOSEEV Returns Approximately $11,528.62 in Goods
      Purchased Using MasterCard 6977**

35.   In addition to the purchases made on MasterCard 6977
set forth above, goods were also returned to the retail stores

21

Instrumentality Protocol

in exchange for credit on gift cards.  I have reviewed
surveillance video and photograph stills from the retail stores
from the dates and times of the returns.  Based on my comparison
of video surveillance from the retail stores and corresponding
photograph stills with the photograph of FEDOSEEV on file with
the DMV, I believe FEDOSEEV returned approximately $11,528.62 in
goods purchased with MasterCard 6977.[3]  Based on my review of
Best Buy receipts and records, I understand that FEDOSEEV
returned these items for credit on Best Buy gift cards.

36.  Based on my review of retail store receipts and
surveillance video and photograph stills therefrom, FEDOSEEV was
seen in the stores at the time of the returns on the following
dates and times:

| Date of Purchase | Approximate Time of Returns according to receipts | Approximate Combined Total of Returns | Retail Store and Location | Approximate Times FEDOSEEV seen on surveillance video |
|---|---|---|---|---|
| January 29, 2016 | Between 5:43 p.m. and 5:47 p.m. | $3,586.07 | Best Buy #393 (West Hollywood, California) | 5:39 p.m., 5:40 p.m., 5:48 p.m. |

[3] As set forth below in paragraph 41, FEDOSEEV was
identified when Magnolia store employees alerted the FBI to the
fact that an individual would be returning items previously
purchased with MasterCard 8116.  LAPD officers conducted
surveillance and observed that individual drive a vehicle
registered to FEDOSEEV.  The address to which the vehicle was
registered was also linked to FEDOSEEVA, whom law enforcement
learned had made a prior robbery report, as set forth in
paragraph 43.

Instrumentality Protocol

| January 29, 2016 | Between 6:51 p.m. and 7:01 p.m. | $1,579.18 | Best Buy #179 (Culver City, Washington) | 6:42 p.m., 7:02 p.m. |
| January 29, 2016 | 8:08 p.m. | $1,373.39 | Best Buy #109 (Los Angeles, California) | 8:05 p.m., 8:08 p.m. |
| January 30, 2016 | 1:52 p.m. | $1,743.99 | Best Buy #393 (West Hollywood, California) | 1:40 p.m., 1:41 p.m., 1:54 p.m. |
| January 30, 2016 | Between 2:49 p.m. and 2:53 p.m. | $3,245.99 | Best Buy #137 (Burbank, California) | 2:43 p.m., 2:54 p.m. |
| | | $11,528.62 | | |

**K.    FEDOSEEV and FEDOSEEVA Use MasterCard 8116 to Purchase $65,933.93 in Goods from Retail Stores**

37.   Based on my review of Magnolia receipts, on January 17, 2016, between approximately 7:30 p.m. and 8:00 p.m., MasterCard 8116 was used to make a combined total of $8,697.64 in purchases at Magnolia Design Center #313 (a home theater store located within Best Buy stores), located inside Best Buy #393, located at 1015 N. La Brea Avenue, West Hollywood, California.  I have reviewed stills from the surveillance video from Magnolia Design Center #313 and Best Buy #393 from that date and time.  Based on my review of the surveillance stills, I observed a male suspect, a female suspect, and another unknown male suspect ("UM2"), enter Best Buy #393 at approximately 7:30 p.m., and at a Magnolia Design Center cashier at approximately

23

Instrumentality Protocol

7:58 p.m. and 8:00 p.m. On the surveillance video, I observed the male suspect holding the card used to effectuate the transaction. The female suspect was observed exiting Best Buy #393 at approximately 8:10 p.m., and the male suspect and UM2 were observed departing Best Buy #393 pushing carts at 8:29 p.m. Having compared this photographic imagery to the DMV photographs on file, I believe FEDOSEEV is the male suspect who can be seen holding the credit card on the surveillance video, and FEDOSEEVA is the female suspect depicted in the surveillance video. UM2 remains unidentified at this time in the investigation.

38. Based on my review of Best Buy receipts, on January 17, 2016, between approximately 8:19 p.m. and 8:25 p.m., MasterCard 8116 was used to make a combined total of $12,109.20 in purchases at Best Buy #393, located at 1015 N. La Brea Avenue, West Hollywood, California. I have reviewed stills from the surveillance video from Best Buy #393 from that date and time. Based on my review of the surveillance stills, I observed a male suspect, a female suspect, and UM2, enter Best Buy #393 at approximately 7:30 p.m. The female suspect was observed exiting Best Buy #393 at approximately 8:10 p.m., and the male suspect and UM2 were observed departing Best Buy #393 pushing carts at 8:29 p.m. Having compared this photographic imagery to the DMV photographs on file, I believe FEDOSEEV is the male suspect depicted on the surveillance video, and FEDOSEEVA is the female suspect depicted in the surveillance video. On February 22, 2016, FBI Agents and LAPD Detectives interviewed Carla Ford, a Best Buy Asset Protection employee who worked at Best Buy

24

Instrumentality Protocol

#393, located at 1015 N. La Brea Avenue, Los Angeles, California. Ford was shown pictures of FEDOSEEV, FEDOSEEVA, and PATAPAU.  Ford identified FEDOSEEV as the individual who made the purchases on MasterCard 8116 on January 17, February 4, and February 5, 2016; FEDOSEEVA as very similar to the individual who accompanied FEDOSEEV on February 5, 2016; and PATAPAU as the individual who had made purchases on January 17, 2016 and returned items several days later.

39.  Based on my review of credit card transaction records, Rapport International Furniture Receipts, and my conversations with other law enforcement agents, I have learned that MasterCard 8116 was used to make an additional $45,127.09 in purchases at Rapport International Furniture on January 17, 2016 between 4:55 p.m. and 6:14 p.m.  No surveillance video of the transactions was available upon request.  On February 11, 2016, FBI Agents and LAPD Detectives interviewed employees at Rapport International Furniture, located at 435 N. La Brea Avenue, Los Angeles, California.  The employees identified FEDOSEEV and FEDOSEEVA as the individuals who had made the purchases on January 17, 2016, using MasterCard 8116.

40.  Based on my review of receipts from Rapport International Furniture, I know that the items purchased with MasterCard 8116 include:  A grey Fly modular sofa with chaise longue, a taupe Riflesso rug, a grey Viaggio armchair, a 10" high Tempo central table, a walnut 350 credenza with three drawers, a beige Riflesso rug, a Volo reclining sofa, a Hyper model 2026 cocktail table, a Skagen dining table, a Haven laptop

25

Instrumentality Protocol

desk with caviar glass and smoke grey walnut finish, a beige
Poliziano sofa, a white Logos armchair, and a Ferrari Red
Parabolica swivel chair.

L.   **FEDOSEEV Exchanges Purchase Made at Magnolia #313**

41.   On February 4, 2016, FBI agents and LAPD Detectives
were informed by employees at Magnolia Design Center #313 that
the employees had received a call from someone stating they
wanted to return a television previously purchased.  These
employees had previously been interviewed by law enforcement
regarding this and other similar purchases and as such, the
employees called law enforcement to alert them to the return.
Agents and Detectives observed FEDOSEEV enter Best Buy #393 and
then exit with a large black box with the words "LG OLED TV" on
it.  FEDOSEEV was wearing a green jacket similar to the one he
wore on January 17, 2016, when the original purchases were made.
FEDOSEEV was observed loading the television into SUBJECT
VEHICLE 2.  LAPD surveillance units followed SUBJECT VEHICLE 2
to SUBJECT PREMISES 1, where it entered an underground parking
garage.  Law enforcement looked into SUBJECT VEHICLE 2 and saw
that the television was no longer inside the vehicle.  Checks by
LAPD detectives of DMV records revealed that FEDOSEEV is the
registered owner of SUBJECT VEHICLE 2, which is registered to
SUBJECT PREMISES 1.

M.   **Items Purchased at Best Buy, Target, and Apple**

42.   Based on my review of Best Buy, Target, and Apple
receipts, I know that items purchased using MasterCard 4504,
MasterCard 6977, and MasterCard 8116 included televisions,

26

Instrumentality Protocol

computer tablets, media players, smart watches, cellular telephones, drones, laptop computers, computer software, hard drives, routers, cameras, audio headphones and speakers, robotic vacuums, video game consoles and games, cameras, electric razors, toothbrushes, and streaming devices.

### N.   Follow-Up On FEDOSEEVA Robbery Report

43.   Based on my review of LAPD reports and my conversations with other law enforcement agents, I have learned that, on or about January 16, 2016, FEDOSEEVA reported to the LAPD that she had arranged to sell a MacBook Pro laptop computer through Cragislist, an online classifieds website, to an unidentified individual, who had then robbed her at gunpoint of the item.  On February 23, 2016, LAPD detectives conducted a follow-up interview of FEDOSEEV and FEDOSEEVA at their residence, SUBJECT PREMISES 1.  While conducting the interview, Detectives observed new furniture and one large piece of furniture still in its plastic wrapping inside the apartment. They also observed an LG television sitting on a TV stand in the living room, which appeared to be of the same make and model of the television that FEDOSEEV was seen carrying out of Best Buy #393 on February 4, 2016.  During this follow-up interview, FEDOSEEVA showed Detectives a notebook, which appeared to keep records of items sold by FEDOSEEVA, including Nikon camera equipment, cellular phones, computers, and the price at which she sold them.  In addition, FEDOSEEVA showed Detectives that she noted the serial numbers for the items sold.

27

Instrumentality Protocol

### O.   Surveillance of PATAPAU

44.   Based on my review of LAPD reports and my
conversations with other law enforcement agents, on March 2,
2016, LAPD officers conducted surveillance of a location on N.
Wilton Place, which law enforcement databases had listed as
PATAPAU's address.  On this day, LAPD officers observed PATAPAU
park SUBJECT VEHICLE 1 in the vicinity of the building.  PATAPAU
then entered the lobby of the building, retrieved mail from a
mailbox, and left the location.  LAPD officers followed PATAPAU
from the location.  In addition to other stops, PATAPAU was
observed conducting a roadside meeting with an unknown male
driving a black Porsche Cayenne bearing California license plate
7FXR507 ("Porsche 7FXR507").  Porsche 7FXR507 parked in front of
PATAPAU, and PATAPAU got out of SUBJECT VEHICLE 1 and into
Porsche 7FXR507 carrying a large white envelope.  After
approximately 15 minutes, PATAPAU got out of Porsche 7FXR507,
back into SUBJECT VEHICLE 1, and drove away.  Surveillance
followed him to SUBJECT PREMISES 2, where he parked SUBJECT
VEHICLE 1 in the building's parking garage.  A check of DMV
records revealed that the Porsche 7FXR507 was registered to
"Sergey Smolin."

45.   Based on my review of FBI reports, I know that PATAPAU
identified Yuliya Patapava as his wife and Yana Patapava as his
child on US Visa application forms.  A search of the Accurint
database identified Yuliya Patapava as having been associated
with SUBJECT PREMISES 2 since February 2016.  In addition, I
understand that Department of Water and Power records reflect

Instrumentality Protocol

Yuliya Patapava as the customer at SUBJECT PREMISES 2 as of
January 13, 2016.

## VII.  TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

46.  In my training and experience, individuals who are
involved in criminal financial activities and computer
intrusions will often keep records pertaining to the crime on
computers, cellular phones, and other digital devices.
Information pertaining to the crime that may be found on digital
devices may include, but is not limited to, contact lists,
communications between parties to the crime, information on how
the crimes were committed, and information specific to the
digital device which shows it was used to facilitate the crime
such as registry, browsing, and log information.

47.  In my training and experience, individuals who are
involved in criminal financial activities and computer
intrusions will sometimes keep items needed to continue their
schemes, and proceeds of their schemes, in their vehicles and
residences, such as fraudulently issued debit and credit cards,
profile information, credit card stock such as "white plastic,"
gift cards, other credit card instruments containing a magnetic
strip, computers, cellular phones, thumb drives, CDs, other data
storage devices, and products purchased through criminal
financial activities.

48.  In my training and experience, individuals who are
committing financial and technology-based crimes of may not
discard or destroy paper documents related to their activities.
These documents can include logs of fraudulent transactions and

29

Instrumentality Protocol

monies received and may refer to names of individuals and companies that have been victimized and payments to or from co-schemers, or records of the sale or transfer of the proceeds of the criminal activity.

49.  In my training and experience, individuals who are committing financial and technology-based crimes who use fraudulently obtained or counterfeit credit and debit cards often use and receive cash in exchange for merchandise or gift cards purchased or received with such cards.

50.  In my training and experience, individuals who are committing financial and technology-based crimes who purchase large amounts of consumer products may sell or "fence" the fraudulently obtained goods via hand-to-hand sales transactions, street level black markets, and/or online platforms such as eBay and Craigslist.  The sale of these items is often dependent upon the item being taken outside of its packaging to assure the purchaser of existence of the actual item, either through a direct visual inspection or photograph.  As such, these items may or may not still be in their original packaging.

51.  In my training and experience, individuals who are committing financial and technology-based crimes utilizing fraudulently obtained or counterfeit credit or debit cards typically use stolen or fictitious personal identification information and documents, including social security numbers, driver licenses, and passports, to create false identities. The false identities are then embossed and/or encoded onto counterfeit or fraudulently obtained credit and debit cards.

Instrumentality Protocol

This allows the criminal to purchase goods and services, such as obtaining rental vehicles, without disclosing their true identities.

### VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

52.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital

31

Instrumentality Protocol

devices and software programs in use today that it is impossible
to bring to the search site all of the necessary technical
manuals and specialized equipment necessary to conduct a
thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

      b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

      c.   The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

32

Instrumentality Protocol

could contain as many as approximately 450 full run movies or 450,000 songs.

   d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

Instrumentality Protocol

Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

      e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can

34

Instrumentality Protocol

record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

      f.   Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

    53.  When searching the SUBJECT PREMISES, it is likely that
Apple brand devices, such as iPads or iPhones, will be found
because numerous Apple products were purchased with MasterCard
6977, MasterCard 8116, and MasterCard 4504.  I know from my
training and experience and my review of publicly available
materials published by Apple that those Apple devices can enable

35

Instrumentality Protocol

what is referred to as "Touch ID," a feature that recognizes up
to five fingerprints designated by the authorized user of the
iPhone. A Touch ID sensor, a round button on the iPhone or
iPad, can recognize fingerprints. The fingerprints authorized
to access the particular device are a part of the security
settings of the device and will allow access to the device in
lieu of entering a numerical passcode or longer alpha-numerical
password, whichever the device is configured by the user to
require. The Touch ID feature only permits up to five attempts
with a fingerprint before the device will require the user to
enter a passcode. Furthermore, the Touch ID feature will not
substitute for the use of a passcode or password if more than 48
hours have passed since the device has been unlocked; in other
words, if more than 48 hours have passed since the device was
accessed, the device will require the passcode or password
programmed by the user and will not allow access to the device
based on a fingerprint alone. Similarly, Touch ID will not
allow access if the device has been turned on or restarted, if
the device has received a remote lock command, or if five
attempts to match a fingerprint have been unsuccessful. For
these reasons, it is necessary to use the fingerprints and
thumbprints of any device's users to attempt to gain access to
any Apple devices found at the SUBJECT PREMISES while executing
the search warrant. The government may not be able to obtain
the contents of the Apple devices if those fingerprints are not
used to access the Apple devices by depressing them against the
Touch ID button. Although I do not know which of the ten finger

36

Instrumentality Protocol

or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

54.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

54.   For all the reasons described above, there is probable cause to believe that FEDOSEEV, FEDOSEEVA, PATAPAU, and SAFIN conspired to use unauthorized access devices in a one-year period to obtain things of value aggregating to $1,000 or more, in violation of 18 U.S.C. § 1029(b)(2).


William Cone, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 18th day of April 2016.


UNITED STATES MAGISTRATE JUDGE

Instrumentality Protocol